UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| ACUITY INSURANCE COMPANY,  )<br>                                                              )<br>            Plaintiff,                              )<br>                                                              )<br>        v.                                              )    CAUSE NO. 2:04-CV-82 PS<br>                                                              )<br>POWERSOURCE TRANSPORTATION, INC.  )<br>and PHANTOM LEASING, INC.,            )<br>                                                              )<br>            Defendants.                        )<br>                                                              )  | |

**OPINION AND ORDER**

Plaintiff Acuity Insurance Company ("Acuity") seeks a declaration that under the commercial general liability ("CGL") insurance policies it issued to Defendants Powersource Transportation, Inc. ("Powersource") and Phantom Leasing, Inc. ("Phantom") that Acuity does not have a duty to defend or indemnify the Defendants in a federal lawsuit for damages arising from a fatal airplane crash.  This matter is before the Court on Acuity's Motion for Summary Judgment, [Doc. 22], and the Defendants' Cross-Motion for Summary Judgment.  [Doc. 32].  Because there are issues of material fact that directly impact whether the "airplane exclusion" is or is not applicable in this case, Acuity's motion for summary judgment is granted in part and denied in part and the Defendants' motion for summary judgment is denied.

**BACKGROUND**

<u>The Accident</u>

Powersource is an Indiana corporation that is in the business of leasing trucks. Phantom is an Indiana corporation that serves as a holding company for some of the trucks used in Powersource's business. In 2002, Powersource hired Todd Zetter as its Executive Vice President. Zetter was employed by Powersource in Griffith, Indiana. At the time he was hired, Zetter and his family resided in Somerset, Kentucky. In order to permit Zetter and his family to visit each other, Powersource agreed to provide, at its expense, transportation for the Zetter family between Griffith, Indiana and Somerset, Kentucky for a period of six months. Specifically, Powersource agreed to provide such transportation on "Company owned or leased aircraft." (*See* Acuity's Ex. 1 at 2.) Todd Zetter could either return to Kentucky on the weekends, or his family could choose to come to Indiana, and then transportation would be provided to return them to Kentucky.

In order to provide for the transportation, Powersource would arrange for an independent contractor, Griffith Aviation, Inc., to provide pilot services for the Zetters. The Griffith Aviation pilot would generally transport the Zetters on either a Cessna 421 aircraft that was owned by Phantom, or on a Beechcraft Bonanza A-36 that was personally owned by Alfred Bakos, President of Powersource and Phantom. Griffith Aviation would then bill the pilot's fee and aircraft fuel to Powersource and/or Phantom.

In the event that Phantom's Cessna or Bakos's Bonanza aircraft were both unavailable for flight, Powersource would request Griffith Aviation to provide another aircraft. (Bakos Aff. ¶ 9.) Bakos, in an affidavit supplied to the Court, testified that this was only done when

specifically approved and agreed to by Bakos in advance of the flight. (*Id.*) In such situations, Powersource would not be billed for use of the Griffith Aviation supplied aircraft; rather, a trade of air time between the plane that was actually used and the Phantom Cessna would be affected.

On February 11, 2003, Zetter contacted Powersource employee, Lisa Premil, and requested that a plane be sent to Somerset, Kentucky to pick up his wife and children. Premil contacted Griffith Aviation and arranged for a pilot to fly Phantom's Cessna to Kentucky to pick up the Zetter family and fly them to Indiana. (Premil Aff. ¶ 4.) Premil advised Griffith Aviation that the Zetter family would be returning to Kentucky on February 16, 2003, and he requested a pilot to fly the family back to Kentucky using the Bonanza aircraft that was owned by Bakos. (*Id.* ¶ 5.) It is undisputed that the Bonanza aircraft was not used. Instead, a Cessna 421 (not to be confused with Powersource's Cessna 421) which was owned by Great Northern Aircraft, Inc. ("Great Northern") was used.

The circumstances surrounding how Great Northern's Cessna 421 came to be used are not clear to the Court on the record it has before it. But, the evidence before the Court is that no one notified either Bakos or Premil that the Bonanza aircraft was not going to be used for the Zetters' return flight to Kentucky flight and that Bakos did not approve or agree to the use of Great Northern's Cessna 421. (Bakos Affidavit ¶ 16; Premil Affidavit ¶ 7.)

On February 16, 2003, the Cessna 421 was piloted by Shalabh Agarwal, a Griffith Aviation employee.[1] The aircraft crashed while on approach to the Somerset–Pulaski County

---

[1] The underlying complaint alleges that the pilot was employed by and/or acting as the agent of "defendants, Griffith Aviation, Inc., Powersource, Phantom Leasing, Inc. and Goldsmith." (*See* [Doc. 32], Ex. A, the Second Am. Underlying Compl. (hereafter the "Underlying Compl.") at ¶¶ 13, 24, 26, 28, 30.)

Airport in Kentucky. The details of the crash are not clear. Following the crash, it was learned that, in addition to pilot Agarwal, Zetter's wife and four children were on board the flight. There was also a Joseph Maglish on the flight. R.Z. Zetter (the son of Todd Zetter), pilot Agarwal, and Maglish were all killed in the crash. Mia Zetter, the wife of Todd Zetter, was severely injured, and three other Zetter children suffered less severe physical injuries.

On April 29, 2003, the Zetter family filed a lawsuit in the Eastern District of Kentucky alleging numerous claims against Powersource and Phantom including wrongful death, personal injury, loss of parental affection, and against Powersource for breach of contract. The Zetters allege that the Cessna 421 was owned by Great Northern and Paul Goldsmith, and that it was "chartered by defendants, PowerSource and Phantom Leasing." (Underlying Compl. ¶¶ 13, 24, 26, 28, 30.) The Zetters also allege that it crashed "due to the negligent entrustment, operation, leasing and/or maintenance by defendants and/or their agents." (*Id.*)

Acuity commenced suit in this Court, seeking a declaration that it has no duty to defend or indemnify either Powersource or Phantom for claims in the Kentucky federal suit brought by the Zetters due to an "airplane exclusion" contained in the CGL policies it issued to Powersource and Phantom. The defendants, not surprisingly, maintain just the opposite – that the exclusion is inapplicable.

**The Insurance Policies**

Powersource is insured by Acuity under a CGL policy, Number E46599. Phantom is insured under a separate Acuity CGL policy, Number F06246. The policies state in pertinent part as follows:

*** ***

  b.  This insurance applies to *bodily injury* and *property damage* only if:

    (1) The *bodily injury* or *property damage* is caused by an *occurrence* that takes place in the *coverage territory*.

(Defendants' Ex. B & C at Sec. 1.1b(1)., emphasis in original.)

*** ***

  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(*Id.* at Sec. V.13.)

*** ***

  This insurances does not apply to:

*** ***

  g.  Aircraft, Auto or Watercraft

    *Bodily injury* or *property damage* arising out of the ownership maintenance, use or entrustment to others of any aircraft, *auto* or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and *loading or unloading*.

(*Id.* at Sec. 1.2.g., emphasis in original.)

  During the course of the underlying action, Acuity "investigated the circumstance surrounding the Defendants' use of the Great Northern plane" involved in the crash, likely to determine on its own whether it thought the airplane exclusion was applicable.  (Plaintiff's Mem. at 3.)  Acuity contends that there was a barter arrangement among the defendants, Great Northern and Griffith Aviation.  In support of its contention, Acuity relied on an interrogatory answer in the underlying action.  The interrogatory asked Powersource to "Describe the financial arrangement between Griffith Aviation and Powersource for the flight of the airplane that

5

crashed outside Somerset, Kentucky on February 16, 2003." Bakos, on behalf of Powersource, originally answered as follows:

> No bill has been rendered by Griffith Aviation, Inc., to Powersource for the flight of the airplane that crashed outside Somerset, Kentucky on February 16, 2003.  Normally, the arrangement was that the pilot's fee would be billed to Powersource for the Zetter family flights…Aircraft time was never billed to Powersource for the use of the airplane that crashed outside Somerset, Kentucky on February 16, 2003; rather a trade of airtime between that plane and a similar aircraft owned by Phantom Leasing, Inc., was affected.

(Plaintiff's Ex. A at 8-9.)  Bakos has since amended Powersource's answer, now stating:

> Powersource arranged for Griffith Aviation, Inc. to provide a pilot to transport Mr. Zetter's wife and four children on a Bonanza A-36 aircraft owned by Alfred E. Bakos.  Griffith Aviation, Inc. was to bill Powersource and/or Phantom a pilot's fee and fuel charges.  However, for reasons currently unknown to Powersource, the Griffith Aviation, Inc. pilot, Shalabh Agarwal, used a Cessna 421 aircraft that was owned by Great Northern Aircraft, Inc. for the February 16, 2003 flight.  There was no agreement or other financial arrangements by and between Powersource and Griffith Aviation, Inc. for the use of Great Northern Aircraft, Inc.'s Cessna 421 on February 16, 2003.

(Defendants' Ex. D at Ex. 2.)

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party.  *Doe v. R.R. Donnelly & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  The non-moving party must then set forth specific

facts showing there is genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-23 (1986).

**I.     Interpretation of Insurance Contracts**

Insurance contracts are governed by the same rules of construction as other contracts. *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 243 (Ind. 2000).[2] When policy language is clear and unambiguous, it should be given its plain and ordinary meaning. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985). Generally, the interpretation of an insurance contract is a question of law appropriate for summary judgment, even where a policy is ambiguous. *Id.*; *Terre Haute First Nat'l Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336, 1337 (Ind. Ct. App. 1993).

All exclusions, exceptions, and limitations in an insurance policy must be plainly expressed. *Am. Family Life Assurance Co. v. Russell*, 700 N.E.2d 1174, 1177 (Ind. Ct. App. 1998), *trans. denied*. "The exclusionary clause must clearly and unmistakably bring within its scope the particular act or omission that will bring the exclusion into play, and any doubts to the coverage under the policy shall be construed against the insurer to further the policy's basic purpose of indemnity." *Id.* Strict construction against the insurer is "driven by the fact that the insurer drafts the policy and foists its terms upon the customer." *Stevenson v. Hamilton Mut. Ins.*

---

[2]As a federal court sitting in diversity, we apply the law of the forum state – in this case Indiana – to resolve substantive questions. *Auto. Fin. Corp. v. Smart Auto Ctr., Inc.*, 334 F.3d 685, 688 (7th Cir. 2003); *Merrill v. Trump Ind., Inc.*, 320 F.3d 729, 731 (7th Cir. 2003).

*Co.*, 672 N.E.2d 467, 471 (Ind. Ct. App. 1996), *trans. denied* (citation omitted); *see also Hoosier Ins. Co. v. Audiology Found. of Am.*, 745 N.E.2d 300, 307 (Ind. Ct. App. 2001), *trans. denied*.

**II.     Insurance Coverage or Defense for Claims Arising from the Accident**

The cross-motions for summary judgment raise two issues: 1) whether Acuity has a duty to defend and indemnify the Defendants in the underlying federal lawsuit on the claims alleging wrongful death and negligence; and 2) whether Acuity has a duty to defend and indemnify Powersource on the breach of contract claim in the underlying federal lawsuit. As described more fully below, there are questions of fact that remain on the first issue, but on the second issue there is plainly no coverage under the policy for the breach of contract claim.

**A.     Applicability of Airplane Exclusion**

The central issue in this case is whether the airplane exclusion is applicable. Not surprisingly, Acuity contends that it applies as a matter of law and Powersource and Phantom maintain that it is inapplicable as a matter of law. On the record before the Court, there are simply too many questions of material fact to determine the applicability of the airplane exclusion at this time.

Under Indiana law, an insurer's duty to defend its insured is broader than its duty to indemnify. *Jim Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co. of Wis.*, 791 N.E.2d 816, 823 (Ind. Ct. App. 2003), *trans. denied*, 804 N.E.2d 756 (Ind. 2003). Courts determine the insurer's duty to defend from the allegations contained within the complaint and from those facts known or ascertainable by the insurer after reasonable investigation. *Id.*; *see also Liberty Mut. Ins. Co. v. OSI Indus., Inc.*, 831 N.E.2d 192, 198 (Ind. Ct. App. 2005).

The rationale for permitting an insurer to look beyond the face of the complaint and to conduct its own investigation is to avoid fraud perpetrated upon the insurer in that allegations of the complaint could be intentionally framed to force the insurer to appear and defend. *Liberty Mut. Ins. Co. v. Metzler*, 586 N.E.2d 897, 902 (Ind. Ct. App. 1992), *trans. denied*. (citations omitted). Looking to matters beyond the complaint is also for the insured's benefit. If the duty to defend is determined solely from the allegations in the complaint, the insured would be at the mercy of its adversary's pleading skills. *See Travelers Ins. Co. v. Penda Corp.*, 974 F.2d 823, 827 (7th Cir. 1992) (discussing Illinois law). Depending on the case, the adversary may or may not be interested in triggering the insured's coverage. *Id.*

The policies exclude:

> *Bodily injury* or *property damage* arising out of the ownership maintenance, use or entrustment to others of any aircraft, *auto* or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and *loading or unloading*.

The plaintiffs in the underlying action allege that their injuries were caused by the "negligent entrustment, operations, leasing and/or maintenance by defendants and/or their agents" of the aircraft in question. (Underlying Compl. ¶ 13.) The plaintiffs also allege that Powersource and Phantom "chartered" the Cessna 421 and that it was "commanded and piloted by Shalabh Agarwal, within the scope of his employment and/or as the agent of defendants, Griffith Aviation, PowerSource, Phantom Leasing and Goldsmith." (*Id.*)

Acuity urges the Court to enter judgment in its favor and find that the airplane exclusion is applicable and bars coverage based solely on the allegations in the underlying complaint. (*See* Pl. Reply at 2.) However, Acuity in its own opening Memorandum in support of its motion for

9

summary judgment goes beyond the allegations in the underlying complaint and relies on interrogatory answers by Powersource to support its position. (*See* Pl. Mem. at 9.)

The Defendants contend that the Court may look beyond the allegations in the underlying complaint in determining whether the airplane exclusion applies. In fact, the Defendants cite to a number of cases in which Indiana courts have consistently considered evidentiary materials beyond the allegations in the underlying complaint at the summary judgment stage. *See*. *e.g.*, *State Farm Fire & Cas. Co. v. T.B.*, 762 N.E.2d 1227, 1233 (Ind. 2002) (testimony of the underlying plaintiff and insureds); *Illinois Farmers Ins. Co. v. Wiegand*, 808 N.E.2d 180, 186 (Ind. Ct. App. 2004) (affidavit of expert): *Indiana Farmers Mut. Ins. Co. v. Imel*, 817 N.E.2d 299, 305 (Ind. Ct. App. 2004) (testimony of insured and witness); *Trisler v. Indiana Ins. Co.*, 575 N.E.2d 1021, 1025 (Ind. Ct. App. 1991) (affidavits of witnesses); *Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1100 (Ind. Ct. App. 1997), *trans. denied* (affidavit of insured).

Powersource and Phantom have provided the Court with, among other things, Bakos's affidavit and Premil's affidavit. At this stage of the litigation, the Court simply cannot ignore this evidence. Specifically, Bakos avers that the Cessna 421 involved in the crash was not "owned" by the Defendants, was not "operated" by the Defendants, was not "rented nor leased" by the Defendants, was not "loaned" to the Defendants, and that the Defendants did not "borrow" the aircraft at issue. (*See* Bakos Aff. ¶¶ 20-23.) Moreover, the interrogatory answer that Acuity relies on has since been amended by Powersource. *See* Fed. R. Civ. P. 26(e)(2) ("A party is under a duty seasonably to amend a prior response to an interrogatory … if the party learns that the response is in some material respect incomplete or incorrect"). While at trial a finder of fact may look askance at the amendment of the interrogatory answer, that is a

credibility issue, which is a determination that a court cannot make at the summary judgment stage of the proceedings.  *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ( "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.").

Premil's affidavit states that she requested a pilot to fly the Zetter family back to Kentucky using the Bonanza aircraft that was owned by Bakos, and that no one ever notified her that the Bonanza aircraft was not going to be used.  In addition, Premil provides that no one ever requested that another aircraft be used beside the Bonanza.  (*See* Premil Aff. ¶¶ 5-9.)

Considering this evidence, as we believe we clearly can under Indiana law, a number of issues of material fact are raised.  They include, but certainly are not limited to: 1) whether the Cessna 421 was "used" by Powersource and Phantom on February 16, 2003; 2) whether the Cessna 421 was "rented" to Powersource or Phantom on February 16, 2003; 3) whether the Cessna 421 was "loaned" to Powersource or Phantom on February 16, 2003.

It is simply unclear to the Court just exactly how the Zetter family came to be passengers on Great Northern's Cessna 421 on February 16, 2003.  Maybe the pilot knew them from prior flights and was heading for Kentucky and took the Zetters along since the Bonanza was unavailable.  Perhaps Powersource had no involvement at all in helping to procure the doomed aircraft.  Who knows?  At the end of the day there may be a substantial likelihood that Acuity has the better position and the airplane exclusion may ultimately be applicable.  But the evidence has to establish it.  Thus, Acuity has to prove that the aircraft was either "owned or operated" by the insureds or "rented" or "loaned" to them.  The Court is simply unable to make such a finding on the record currently before it.

B.  **Breach of Contract Claim**

Acuity argues that it does not have a duty to defend and indemnify Powersource on the breach of contract claim in the underlying lawsuit because it arose from a contractual relationship and not from an "occurrence" and is therefore not covered under the CGL policy. Powersource claims that it is entitled to coverage because a negligent breach of contract sounds in tort and is thus an occurrence under the policy. Acuity clearly has the better of this argument.

The CGL policy provides that the insurance only applies to "bodily injury" or "property damage" that is "caused by an occurrence." (Defendants' Ex. B & C at Sec. 1.1b(1).) "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at Sec. V.13.)

Indiana courts have consistently held that claims arising out of a contractual relationship are not an "occurrence" or "accident." *See Jim Barna Log Sys.*, 791 N.E.2d at 824 ("in a CGL Policy, the coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained") (citations omitted); *Terre Haute First Nat'l Bank*, 634 N.E.2d at 1338 (finding that claims against bank, alleging negligence and breach of fiduciary duty in acting as a guardian, arose from a professional relationship, and therefore did not arise from an "accident" and thus was not the result of an "occurrence"); *see also R.N. Thompson & Assocs., Inc. v. Monroe Guaranty Ins. Co.*, 686 N.E.2d 160, 164 (Ind. Ct. App. 1997) (holding that economic losses arose out of a contractual relationship and not from an "occurrence" policy).

Powersource relies on *Orkin Exterminating Company, Inc. v. Walters*, 466 N.E.2d 55, 58 (Ind. Ct. App. 1984), for the proposition that a party may sue for negligent breach of a contractual duty. *Walters* simply states that Indiana law recognizes that a plaintiff has the "option of suing in tort or in contract for the negligent performance of a contractual duty." *Id.* Here, the Zetters chose to sue in contract, not in tort, regarding Powersource's duty to provide transportation.

The eighth claim for relief in the underlying complaint is entitled "Breach of Contract," and alleges that Powersource "breached the contract and breached the implied covenants of the contract" to "provide" Zetter and members of his family "transportation between Griffith, Indiana and Somerset, Kentucy on aircraft *owned* by PowerSource or *leased* by PowerSource." (*See* Underlying Compl. at ¶¶ 32, 35.) (emphasis supplied.). While the Zetters may never have sued for breach of contract absent the fatal accident on February 16, 2003, the breach of contract claim did not arise from that accident, instead it arose from the Employment Agreement entered into between Powersource and Todd Zetter. (*See* Acuity's Ex. 1 at 2.)

For example, even if the Cessna 421 had not crashed on February 16, 2003, the Zetters may still have had a valid breach of contract claim against Powersource. To prevail, all the Zetters would need to prove is that Powersource did not own the Cessna 421 which transported the Zetter family (which all evidence suggests was owned by Great Northern) and that Powersource did not lease the Cessna 421 (as Bakos's affidavit indicates).

Clearly, this claim does not sound in tort. Unlike the five negligence claims in the underlying complaint, the eighth claim for relief, by its own terms, sounds in contract. The breach of contract claim did not arise from the "accident" and any breach of contract was not an

13

"occurrence" under the policy.  Therefore, Acuity does not have a duty to defend or indemnify Powersource on the breach of contract claim (Claim 8) in the underlying litigation.

## CONCLUSION

For the foregoing reasons, Plaintiff Acuity Insurance Company's Motion for Summary Judgment [Doc. 22] is hereby **GRANTED IN PART AND DENIED IN PART**.  Acuity Insurance Company does not have a duty to defend and indemnify Powersource on the breach of contract claim (Claim 8) in the underlying lawsuit.  Defendants Powersource Transportation, Inc.'s and Phantom Leasing, Inc.'s Motion for Summary Judgment [Doc. 32] is hereby **DENIED** in its entirety.

**SO ORDERED**.

ENTERED: August 29, 2005

<u>s/ Philip P. Simon</u>
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT